IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE WU GROUP, ET AL,<br><br>    Plaintiffs,<br><br>  v.<br><br>SYNOPSYS, INC., et al.,<br><br>    Defendants. | No. C 04-3580 MJJ<br><br>**ORDER DISMISSING PLAINTIFFS' COMPLAINT WITHOUT PREJUDICE** |

## INTRODUCTION

Before the Court is Defendants' motion to dismiss this private securities fraud action. Plaintiffs Yeushyr Wu, Robert Wiederhold, Hosein Naaseh-Sahry, and Thomas Ratcliffe, individually and on behalf of the Sara Eastwood Family Trust (collectively, the "Wu Group"), representing a purported class of all purchasers of Synopsys, Inc., stock between December 23, 2003 and August 18, 2004, oppose the motion. Also before the Court is Defendants' Rule 11 motion for sanctions. Oral argument on Defendants' motions was heard on August 2, 2005. At that hearing, the Court ordered the parties to submit supplemental briefing related to Defendants' motion for sanctions. Supplemental briefing has now been filed and the Court has carefully read and considered all the papers submitted. For the following reasons, the Court **GRANTS** Defendants' motion to dismiss without prejudice and **DENIES** Defendants' motion for sanctions.

**FACTUAL BACKGROUND**

**A.   Background**

Defendant Synopsys, Inc. (hereinafter, "Synopsys" or the "Company"), headquartered in Mountain View, California, manufactures electronic design automation ("EDA") software, which is used to design complex integrated circuits ("ICs") and systems-on-chips ("SoCs") in the global semiconductor and electronic industries. Defendant Aart J. de Geus is the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Synopsys. Defendant Steven K. Shevick is the Company's Chief Financial Officer ("CFO") and Senior Vice President of Finance. Defendant Vicki L. Andrews was Senior Vice President of Worldwide Sales at Synopsys, Inc. during the relevant time period.[1] Synopsys sells three types of licenses for its EDA software: (1) technology subscription licenses ("TSLs"), which provide particular and unspecified future technology for a finite period; (2) perpetual licenses, which provide particular technology for as long as the customer renews maintenance (which is purchased separately) plus 20 years; and (3) term licenses, which provide particular technology for a finite period. Customer support, referred to as "maintenance," is included (or bundled) with TSLs but must be purchased separately for perpetual and term licenses. Synopsys recognizes revenue up front for sales of perpetual licenses and for those term licenses for which at least 75% of the license fee is due within one year of shipment. This is referred to as "upfront license revenue." Synopsys recognizes revenue over time for sales of TSLs, for term licenses for which less than 75% of the license fee is due within one year, and for maintenance sold in connection with perpetual and term licenses. This type of revenue is referred to as "time-based license revenue." Synopsys performed a stock split in September 2003.

In its 10-K filing for fiscal year ("FY") 2003,[2] Synopsys reported substantial revenue growth, but noted that the semiconductor industry had experienced its "steepest and longest downturn of the

---

[1] In their original complaint, Plaintiffs named Richard T. Rowley, who served as Vice President, Corporate Controller, and Treasurer of Synopsys during the relevant time period, as a Defendant but did not name Vicki Andrews. In the operative Consolidated Amended Class Action Complaint, however, Plaintiffs appear to have dropped Mr. Rowley as a Defendant (although his name remains in the pleading's caption) and to have added Ms. Andrews. In their opposition to Defendants' motion, Plaintiffs' caption page lists Ms. Andrews, and not Mr. Rowley, as a Defendant.

[2] Synopsys' fiscal year begins on November 1.

2

past 20 years" from 2000 through 2002. (2003 Form 10-K at 18.)  In the 10-K, Synopsys advised that despite a "moderate recovery in 2003," its customers "have remained cautious," and that it was not "yet clear when improved demand" would cause customers to increase spending. (*Id*. at 19.) In FY 2003, the proportion of revenue Synopsys earned from time-based revenue sources increased markedly.  Time-based and upfront license revenue constituted 67% and 33%, respectively, of software license revenues in FY 2003, as compared to 60% and 40%, respectively, in FY 2002.

On December 3, 2003, Synopsys issued a press release providing financial projections for FY 2004.  The Company projected revenue of $1.2 – $1.25 billion and earnings of $1.50 to $1.60 per share.  The press release expressly cautioned that the projections were "forward-looking" and that the actual financial results could differ materially due to a number of enumerated factors, including continued or increased weakness in the semiconductor or electronic systems industries; lower-than-anticipated research and development spending by customers; lower-than-anticipated or delayed purchases of the Company's products; and competition. (Declaration of Jack I. Siegal ("Siegal Decl."), Ex. B at 6–7.)  The December 3, 2003, press release also provided financial projections for FY 2005.  The Company reported that for FY 2005, it expected $1.4 billion in revenue, *pro forma* earnings of more than $1.90 per share, and GAAP earnings of more than $1.50 per share.

In a conference call with analysts that same day, Defendant Shevick reiterated the guidance provided in the press release and explained upcoming changes to the Company's revenue model. (Siegal Decl., Ex. I.)  He said that beginning in FY 2004, Synopsys would shift the license mix in favor of renewable (i.e. time-based) licenses but would maintain the current 75/25% balance between orders with time-based revenue recognition and orders with upfront revenue.  He explained that the Company would do this through the use of TSLs, a license that has attributes of both time-based and perpetual licenses.  He reported that the Company expected that perpetual licenses for the year would account for less than 10% of the license orders and renewable licenses would account for more than 90% of the orders.  At the beginning of the analyst call, the operator noted as follows:

> During the course of this conference call, Synopsys may make predictions, estimates and other forward-looking statements regarding the Company.  While these statements represent the best current judgment about the Company's future performance[,] the actual performance is subject to significant risks and uncertainties that could cause actual results to differ materially from those that may be projected.  In addition to any risks that may be highlighted during the

3

> conference call, important factors that could cause the Company's actual results to differ materially from those that may be projected in this conference call are described in the most recent 10-K and 10-Q reports of Synopsys on file with the Securities and Exchange Commission.

On December 16, 2003, Defendant de Geus sold 212,500[3] personal shares of Synopsys stock at $34.33 per share. The same day, Defendant Andrews sold 88,785 personal shares of Synopsys stock at $33.07 per share. Defendants de Geus and Andrews reaped more than $10 million from their sales. According to Plaintiffs, the sales were "dramatically out of line with these defendants' prior trading practice and were impeccably timed to reap the maximum benefit while Synopsys common stock traded at or near its highest price during calendar year 2003 and the Class Period." (Complaint at ¶ 62.) However, in May 2003 and in June 2002, Defendant Andrews had sold 58,060 shares and 50,000 shares, respectively. Defendant de Geus' sale included the exercise and sale of 162,000 options that were scheduled to expire in April 2004.

In a December 19, 2003, interview on CNN, Defendant de Geus said:

> . . . One of the things that makes Synopsis stand out as a software company is actually how stable the model has been. One of the reasons it's so stable is because instead of just selling software, [we] sell subscriptions. Just like, you know, "Time" magazine or "Newsweek," we recognize the revenue over the time of the subscription, which is typically three years in our case. And that makes for a very solid and predictable business.
> ***
> And one of the pieces of news that people don't fully appreciate yet is we're entering the fiscal year with 60 percent of the revenue in hand and about 80 percent for the first quarter. So that takes a lot of risk off investors.

In a February 23, 2004 press release, Synopsys announced that for the first quarter ("Q1") of 2004, the Company had met or exceeded the prior guidance. (Siegal Decl., Ex. C at 1–2.) The Company also provided guidance for Q2 04 and revised (i.e. lowered) the previous guidance for FY 2004. (*Id*. at 2–3.) The release expressly cautioned that the projections were "forward-looking" and that actual results could differ materially due to various factors, including, but not limited to, the same factors listed in the December 3, 2003, release. (*Id*. at 8–9.) In a conference call with analysts that same day, Defendant Shevick reported that the Company had lost some business in the first

---

[3] Defendants contend that de Geus actually sold 212,000 shares, not 212,500 shares.

4

1  quarter of 2004 because the Company was "hanging tough on pricing," but that that business was re-
2  gained in Q2. (Siegal Decl., Ex. J at 9.)  At the beginning of that call, the operator gave a "forward-
3  looking" caveat like the one given in the December 3, 2003, analyst call.  (*Id*. at 1.)

4        On May 19, 2004, Synopsys issued a press release announcing the financial results for Q2
5  04, which again met the prior guidance. (Siegal Decl., Ex. D at 1–2.)  In the press release, the
6  Company provided guidance for Q3 04 and again revised (i.e. lowered) the forecast for FY 2004.
7  (*Id*. at 2–3.)  Synopsys again cautioned that the projections were "forward-looking" and that actual
8  results could differ materially due to, *inter alia*, customers' continued budgetary caution; lower-
9  than-expected customer spending or design starts; lower-than-expected or delayed purchasing; and
10  competition.  (*Id*. at 8–9.)  In a conference call with securities analysts held later that day,
11  Defendants de Geus and Shevick reiterated the Company's guidance for Q3 04 and for FY 2004.
12  (Siegal Decl., Ex. K.)  In response to a question about whether de Geus was more positive about the
13  environment than he had been in the February conference call, Defendant de Geus said, "Bottom
14  line, yes."  At the beginning of that call, the operator gave a "forward-looking" caveat like the one
15  given in the December 3, 2003, and February 23, 2004, analyst calls.

16        On Monday, August 2, 2004, Synopsys announced – for the first time in its history –
17  preliminary quarterly results lower than those forecast:  revenue was expected to be $279–283
18  million (rather than the $300–320 million projected), and non-GAAP earnings were expected to be
19  $.31 – $.34 per share (rather than the $.35 – $.40 per share projected).  (Siegal Decl., Ex. E.)  The
20  press release explained that the results were "primarily due to lower-than-expected bookings during
21  the quarter, and to delays in certain customer purchasing decisions near the end of the quarter."  (*Id*.)
22  The release advised that in the upcoming August 18, 2004, earnings release, the Company would
23  provide revised projections for FY 2004 and FY 2005.

24        Following the August 2, 2004, press release, the price of Synopsys common stock dropped
25  by 16.8% to close at $21.05 per share.

26        On August 18, 2004, Synopsys reported its results for Q3 04.  (Siegal Decl., Ex. F at 1–2.)
27  Revenue was reported at $281.7 million – 6.1% less than forecast.  (*Id*. at 1.)  Non-GAAP earnings
28  were $.33 per share – 5.1% less than forecast.  (*Id*. at 2.)  This was the first time that Synopsys had

5

not met its guidance.  Synopsys also revised its projections for FY 2004 and FY 2005.  For FY 2004, the Company was now forecasting total revenue of $1.08 – $1.11 billion and earnings of $1.01 – $1.05 per share.  The Company had previously forecast $1.17 billion and $1.35 per share.  For FY 2005, the Company was now forecasting revenue of about $940 million and earnings of $.28–.38 per share.  Previous guidance had forecast $1.29 billion in revenues and earnings per share of $1.60.

Following the August 18, 2004 earnings release, the price of Synopsys shares dropped by another $6.63 per share – a 31.16% drop – to close at $14.65 per share on August 19, 2004.

**B.     The Complaint**

On August 25, 2004, Plaintiffs filed the instant lawsuit.  In their Consolidated Amended Class Action Complaint (hereinafter, the "Complaint"), Plaintiffs allege that between December 3, 2003, and August 18, 2004 (the "Class Period"), Defendants Synopsys, de Geus, Shevick, and Andrews (collectively, "Defendants") engaged in conduct that violated §§ 10 and 20 of the Securities Exchange Act of 1934 and Rule 10 b-5 promulgated thereunder.  Specifically, Plaintiffs allege that Defendants made false or misleading statements, or withheld material information, about Synopsys' financial prospects in:  (1) the December 3, 2003, February 23, 2004, and May 19, 2004 press releases; (2) the December 3, 2003, and May 19, 2003, analyst conference calls; and (3) a December 19, 2004, CNN interview.  Plaintiffs allege that Defendants knew by late 2003 that the Company was losing "valuable sales contracts" due to customer discontent with the Company's increased emphasis on time-based licenses – which required customers to pay up-front – and would inevitably experience a resulting "material revenue shortfall," rendering the Company unable to meet its "lofty" projections.  According to Plaintiffs, Defendants failed to disclose, in the press releases, conference calls, and CNN interview, that they knew that Synopsys' time-based licensing efforts were not succeeding due to customer dissatisfaction with the scheme.  Plaintiffs allege that the statements made in the press releases, conference calls, and CNN interview, about the Company's positive financial outlook were false and misleading in light of what Defendants knew about the inevitable downturn.

In support of their allegations that Defendants de Geus, Shevick, and Andrews (the "Individual Defendants") knew or recklessly disregarded the false and misleading nature of their

6

statements regarding Synopsys' financial prospects (and were aware that Synopsys would not meet its financial projections for FY 2004 and FY 2005), Plaintiffs rely on statements allegedly made by a former supervisor ("Supervisor") of the Company's Sales and Operations Department, and on statements allegedly made by two former sales support administrators ("SA 1" and "SA 2").[4] According to Plaintiffs, Supervisor stated that during Q1 04, his/her bosses (who indirectly reported to Defendant Andrews) "made a choice to ignore" Supervisor's concerns about material contract losses as represented in a spreadsheet Supervisor had created documenting information relevant to each of Synopsys' North American contracts. (Complaint at ¶¶ 42–43.) Supervisor also allegedly stated that beginning in 2003, Synopsys customers were becoming angry both with the Company's shifting and increasingly confusing licensing arrangements and its practice of unbundling maintenance from licenses, and that Defendants were aware of the customer dissatisfaction and did nothing to alleviate it. According to Plaintiffs, SA 1 and SA 2 corroborate Supervisor's statements. Both SA 1 and SA 2 allegedly confirmed that the trend from upfront licenses to time-based licenses was very confusing to customers. According to SA 1, the unbundling of maintenance from certain licenses angered customers. According to SA 2, Synopsys was indifferent to customer dissatisfaction about the changed license scheme.

Also in support of their scienter allegations, Plaintiffs point to Defendants de Geus' and Andrews' respective sales of their personal shares of Synopsys common stock in December 2003.[5]

Plaintiffs allege that Defendants made false or misleading material statements to, and/or omitted material information from, the investing public in an effort to artificially inflate the price of Synopsys stock. Plaintiffs allege that Synopsys stock was, in fact, artificially inflated and that they were injured by Defendants' conduct when they bought shares of the Company's stock at those artificially-inflated prices during the Class Period. At the end of the Class Period, on August 18, 2004, when Synopsys reported its lower-than-expected financial results for the quarter and revised

---

[4] In their separate motion for sanctions, Defendants contend that they have identified all three anonymous sources relied upon by Plaintiffs and have confirmed, with all three, that none of the statements or sentiments attributed to Supervisor, SA 1, or SA 2 were ever made.

[5] Plaintiffs do not allege a cause of action for insider trading against Defendants de Geus and Andrews, but allege the unusual stock sales only as evidence of scienter.

1  (downward) its expectations for FY 2004 and FY 2005, the Company's stock dropped and shares of
2  Synopsys stock held by Plaintiffs, purchased during the Class Period, depreciated significantly.
3  Thus, they filed this private securities fraud action.

On March 25, 2005, Defendants filed the instant motion to dismiss pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that Plaintiffs have failed to plead their allegations with sufficient particularity. Defendants also filed a Rule 11 motion for sanctions.

**LEGAL STANDARD**

**A.     Federal Rules of Civil Procedure**

A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for the pleading of insufficient facts under an adequate theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984). When deciding upon a motion to dismiss pursuant to Rule 12(b)(6), a court must take all of the material allegations in the plaintiff's complaint as true, and construe them in the light most favorable to the plaintiff. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

In the context of a motion to dismiss, review is limited to the contents in the complaint. *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 385 (9th Cir. 1995). When matters outside the pleading are presented to and accepted by the court, the motion to dismiss is converted into one for summary judgment. However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). Where a plaintiff fails to attach to the complaint documents referred to therein, and upon which the complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support the plaintiff's claim. *See Pacific Gateway Exchange*, 169 F. Supp. 2d at 1164; *Branch v. Tunnell*, 14 F.3d 449, 44 (9th Cir. 1994) (overruled on other grounds). Thus, the district court may consider the full texts of documents that the complaint only quotes in part. *See In re Stay Electronics Sec. Lit.*, 89 F.3d 1399, 1405 n.4 (1996), *cert denied*, 520 U.S. 1103 (1997). This rule precludes plaintiffs "from surviving a Rule 12(b)(6)

8

motion by deliberately omitting references to documents upon which their claims are based." *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 (9th Cir. 1998).

Rule 8(a) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Accordingly, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to the defendants of the charges against them. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 1248, 1257 (N.D. Cal. 2000). Where a plaintiff alleges fraud, however, Rule 9(b) requires the plaintiff to state with particularity the circumstances constituting fraud. To meet the heightened pleading requirements of Rule 9(b), the Ninth Circuit has held that a fraud claim must contain three elements: (1) the time, place, and content of the alleged misrepresentations; and (2) an explanation as to why the statement or omission complained of was false or misleading. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–49 (9th Cir. 1994).

In the securities context, the pleading requirements are even more stringent.

**B.     Private Securities Litigation Reform Act**

In 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995). The PSLRA strengthened the already-heightened pleading requirements of Rule 9(b). Under the PSLRA, actions based on allegations of material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1).

The PSLRA also heightened the pleading threshold for causes of action brought under Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding

9

1  under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of
2  deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc.*, 183 F.3d 970, 974 (9th
3  Cir. 1999). If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion
4  by the defendant, the court must dismiss the complaint. *See* 15 U.S.C. §78u-4(b)(1).

5        The PSLRA's Safe Harbor provision provides that a securities fraud claim may not lie with
6  respect to a statement that is "identified as a forward-looking statement, and is accompanied by
7  meaningful cautionary statements identifying important factors that could cause actual results to
8  differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(I).
9  However, a person may be held liable if the forward-looking statement is made with "actual
10 knowledge . . . that the statement was false or misleading." 15 U.S.C. §  78u-5(c)(1)(B); *No. 84
11 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d
12 920, 936 (9th Cir. 2003); *but see In re Seebeyond Technologies Corp. Sec. Litig.*, 266 F. Supp. 2d
13 1150, 1164-65 (C.D. Cal. 2003) (disagreeing with the analysis in *America West* and finding that a
14 defendant is immune from liability if it satisfies either 15 U.S.C. § 78u- 5(c)(1)(A) or (B)).

15       **ANALYSIS**

16 **I.    Motion to Dismiss**

17       Defendants contend that Plaintiffs' Complaint should be dismissed because Plaintiffs fail to
18 satisfy the heightened pleading requirements under the PSLRA, fail to state a claim under Rule
19 12(b)(6), and fail to plead fraud with the particularity required by Rule 9(b). The Court examines
20 Plaintiffs' claims separately.

21
22     **A.    Plaintiff's First Cause of Action – Violation of Section 10(b) of the Securities
       Exchange Act and Rule 10b-5**

23       Section 10(b) of the Securities Exchange Act (the "Act") provides, in part, that it is unlawful
24 "to use or employ in connection with the purchase or sale of any security registered on a national
25 securities exchange or any security not so registered, any manipulative or deceptive device or
26 contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. §
27 78j(b). Rule 10b-5, promulgated under Section 10(b), makes it unlawful for any person to use
28 interstate commerce:  (a) to employ any device, scheme, or artifice to defraud; (b) to make any

untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5.

For a claim under Section 10(b) and Rule 10b-5 to be actionable, a plaintiff must allege:  (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss.  *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999).  A complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(2).  As discussed above, in order to avoid having the action dismissed, a plaintiff must "plead with particularity both falsity and scienter."  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  The Ninth Circuit, in *Ronconi*, articulated the rule as follows:

> Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry.  In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether 'particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors.'  Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6).

*Id*. (citations and internal quotation marks omitted).

Here, Plaintiffs allege that several statements or omissions attributable to Defendants were false and misleading and that Defendants knew the statements were false and misleading at the time the statements were made.  Defendants contend that Plaintiffs have failed to plead the falsity of Defendants' statements with sufficient particularity and have failed to plead facts that, if true, would raise a strong inference that Defendants acted with scienter.  Defendants also argue that because

11

each of the allegedly misleading statements was "forward-looking," they are protected by the Safe Harbor provision of the PSLRA.

### 1. Falsity

Plaintiffs' claims that Defendants' statements regarding the Company's favorable financial prospects were false or misleading rely on the purported statements of Supervisor, SA 1, and SA 2 (collectively, the "witnesses"). Defendants contend that the Complaint does not plead sufficient facts to raise a strong inference that Defendants made false or misleading statements to investors.[6] The Court agrees.

#### a. Witness Statements About Loss of Contracts

According to Plaintiffs, Supervisor supposedly said that in late 2003 and continuing through the first part of 2004, the Company's contract data, which Supervisor allegedly organized into a spreadsheet, indicated that Synopsys was losing contracts. Supervisor also is purported to have said that the contract data he or she saw made it "obvious" that the Company would not meet its financial projections for FY 2004. These statements, as pled, are insufficient to satisfy the PSLRA's pleading requirements.

First, Plaintiffs' Complaint fails to point to any specific contract data on which Supervisor allegedly based his or her contention that Synopsys was losing contracts. The Complaint refers to a spreadsheet containing sales data that was allegedly created by Supervisor, but makes no reference to specific data contained therein. Specifically, the Complaint fails to identify which contracts were lost, when the contracts were lost, and how much the lost contracts were worth. This omission is fatal. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1028, 1036 (9th Cir. 2002) ("negative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA"); *see also Silicon Graphics*, 183 F.3d at 985 ("a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may

---

[6] For purposes of this analysis, the Court assumes that the witnesses' purported statements are true since, at this stage in the proceedings, the Court must view all facts in the light most favorable to Plaintiffs. The Court will take up Defendants' contention that the purported statements were manufactured in the context of assessing Defendants' motion for sanctions. (*See* discussion, *infra*.)

indicate their reliability"); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087–88 (9th Cir. 2002).

Second, Supervisor's purported conclusion that the contract data, which, as discussed above, was not described in sufficient detail in the Complaint, made it "obvious" that the Company was on a downward trajectory and would not meet guidance for FY 2004, is unsupported by adequate facts. Again, the Complaint does not sufficiently describe the data which allegedly formed the basis for Supervisor's purported conclusion, nor does the Complaint explain the timing of the conclusion or even how the alleged contract losses represented by the spreadsheet would have affected Synposys' future revenue and earnings. *See Juniper Networks, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 4025, at *8 (N.D. Cal. Mar. 11, 2004) (allegations of false financial forecasts insufficient where plaintiffs failed to "plead specific facts demonstrating how the problems being experienced translated into the need for Juniper to alter or reduce its publicly issued projections").

### b. Witness Statements About Loss of Customers

Similarly, the witnesses' statements regarding Synopsys' loss of customers are insufficiently pled. First, the Complaint does not describe which customers Synopsys lost or when and how those alleged losses affected projected revenue or earnings. Second, the conclusions allegedly drawn by Supervisor and SA 1 and SA 2 regarding the reasons that Synopsys was supposedly losing customers are insufficiently pled. The Complaint does not state that the witnesses had any contact with customers or that they spoke with customers about dissatisfaction with the shifting licensing scheme, the unbundling of maintenance from the license arrangements, or the Company's inflexibility on pricing. These statements, as pled, are insufficient to provide a factual basis for Plaintiffs' claims.

---

Plaintiffs' contention that Defendants' statements, during the Class Period, regarding the Company's favorable financial prospects were false or misleading relies on Supervisor's, SA 1's, and SA 2's statements about Synopsys' loss of contracts and customers. Because that factual basis is not pled with sufficient particularity, the Court finds that Plaintiffs have not adequately pled the falsity or misleading nature of Defendants' statements regarding the Company's financial outlook.

**2. Scienter**

13

Plaintiffs' claims that Defendants acted intentionally or with deliberate recklessness similarly rely, nearly exclusively, on the purported statements of Supervisor, SA 1, and SA 2. Plaintiffs also point to Defendants de Geus' and Andrews' allegedly unusual stock sales on December 16, 2003, to support scienter here. Defendants contend that the Complaint does not plead sufficient facts to raise a strong inference that Defendants intentionally, or with deliberate recklessness, made false or misleading statements to investors. Again, the Court agrees.[7]

### a. Witness Statements

According to the Complaint, Supervisor purportedly said that Defendant Andrews reviewed the Company's sales data, in the form of the spreadsheet prepared by Supervisor, and was thus aware that Synopsys was losing contracts. However, Supervisor's statement about what Defendant Andrews saw and knew appears to be based more on speculation or assumption than on actual knowledge. Supervisor's relationship to Defendant Andrews was quite attenuated – Supervisor reported to Becky Dunn who reported to Angela Molzahn who reported to Brad Roberts who reported "directly" to Defendant Andrews. (Complaint at ¶ 38.) Plaintiffs do not allege that Supervisor had any direct contact with Defendant Andrews at all. Supervisor's statement that Dunn, Molzahn, Roberts, and Andrews, who had "a lot of interaction," "reviewed sales and revenue sales figures collectively as a group" is not supported by sufficient facts. (*Id.*) Moreover, Supervisor's baseless conclusion that because "Dunn, Roberts, the legal department, the finance department, and 'a lot of other people' had access to and reviewed [his or her] spreadsheet on a 'regular basis,'" (Complaint at ¶ 42), Defendant Andrews must have also seen it, is too vague to satisfy the PSLRA's heightened pleading requirements regarding scienter.

The Complaint also suggests that SA 1 and SA 2 said that Defendant Andrews and others prepared inflated internal financial forecasts, suggesting that Defendant Andrews had the requisite knowledge of the falsity of the statements issued about Synopsys' financial prospects. However,

---

[7] The Court notes that it necessarily follows that because Plaintiffs have failed to adequately plead the falsity of the statements made by Defendants during the Class Period, Plaintiffs have also failed to plead that Defendants knew their statements were false when made. *See Vantive*, 283 F. 3d at 1091. In any event, the Court finds that Plaintiffs' Complaint fails to plead sufficient facts that give rise to a "strong inference" that Defendants acted with the requisite scienter here.

14

again, Plaintiffs provide no detail about when these reports were created, what the reports said, or how SA 1 and SA 2 were aware of the existence and the content of such reports.  Accordingly, Plaintiffs' Complaint is deficient.

### b. Defendants' Stock Sales

Plaintiffs also rely on the stock sales of Defendants de Geus and Andrews allegedly as an indication of Defendants' scienter.[8]  Generally, stock sale allegations cannot raise an inference of scienter unless Plaintiffs allege specific facts showing that the sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986.  Among the relevant factors for a court to consider are:  1) the amount and percentage of shares sold by insiders; 2) the timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history.  *Id*.

Defendant de Geus sold 210,000 shares of Synopsys stock on December 16, 2003, at $34.33 per share for gross proceeds of approximately $7,103,875.  (Complaint at ¶ 83.)  Defendant Andrews sold 88,785 shares at $33.07 per share on December 16, 2003.  (Complaint at ¶ 84.)  Plaintiffs assert that Mr. De Geus sold approximately 27 % of his holdings and that Ms. Andrews sold approximately 93 % of her holdings that day.  Defendants point out, however, that Plaintiffs' percentage calculations do not account for unexercised stock options.  After factoring in unexercised stock options, Defendants contend that de Geus' sales on December 16, 2003, accounted for approximately 6 % of his Synopsys holdings, and Andrews' sales on December 16, 2003, accounted for approximately 38 % of her holdings.

In light of the three factors above, these sales are not sufficiently suspicious, without more, to raise an inference of scienter.  Mr. de Geus sold a relatively low percentage of his shares just after the end of a quarter.  *See Ronconi*, 253 F.3d at 435.  Moreover, de Geus' sale included the exercise and sale of 162,000 options that were scheduled to expire in April 2004.  The sale of stock at or near the scheduled expiration of options is "perfectly reasonable" and is not suspicious.  *See, e.g.*, *Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680, 687 (E.D. Ky. 2002).

Ms. Andrews sold more shares, proportionally, than de Geus, but a sale of 38 % of one's

---

[8] Notably, Plaintiffs do not allege any suspicious stock sales by Defendant Shevick.

15

shares is not necessarily suspicious. This is particularly true here where Defendant Andrews also exercised 6,015 options on December 16, 2003, and held those shares. Also, Defendant Andrews sold a similar number of split-adjusted shares seven months before the allegedly suspicious sale. Such conduct suggests that Andrews' December 16, 2003, sale of stock was not suspicious. Moreover, Defendants de Geus' and Andrews' stock sales did not occur at a particularly suspicious time, such as immediately before a negative earnings release. *See Wenger v. Lumisys*, *Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998). In fact, they occurred only 13 days into the Class Period, long before most of the challenged statements were made. Accordingly, the Court finds that the December 16, 2003, stock sales do not, alone, provide sufficient indication of scienter here to satisfy the PSLRA's heightened pleading requirements.

### 3. Plaintiffs' Allegations As a Whole

The Court must consider whether the totality of Plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that Defendants made the allegedly false or misleading statements with deliberate recklessness, if not actual knowledge. *Lipton*, 284 F.3d at 1038. Here, the sum is no greater than its parts. Plaintiffs have failed to provide necessary detail regarding any corporate insider's knowledge or access to adverse information. Indeed, Plaintiffs have failed to provide detail as to the existence of any adverse information. The Complaint gives no information about sales numbers at any time during, before or after the Class Period. Weak hints that because the Individual Defendants were directors of Synopsys they would have access to all corporate information, including sales data indicating a downward turn that Plaintiffs claim existed but have not described in any detail, is insufficient. Even coupled with the fact that Defendants de Geus and Andrews sold stock during the Class Period, Plaintiffs' Complaint is still clearly deficient. Plaintiffs have failed to allege any factual basis, let alone "particular facts giving rise to a strong inference" that Defendants had the requisite state of mind.

In sum, Plaintiffs have failed to allege particularized facts that could lead the Court to infer that Defendants intentionally, or with deliberate recklessness, misrepresented Synopsys' financial prospects. Because Plaintiffs' first cause of action "lacks sufficient detail and foundation necessary to meet either the particularity or strong inference requirements of the PSLRA," it must be

16

dismissed. *Silicon Graphics*, 183 F.3d at 984.

///

### 4. Safe Harbor

Having determined that Plaintiffs' Complaint does not satisfy the particularity requirements of the PSLRA, the Court need not address Defendants' contention that Plaintiffs' claim are not actionable because the statements Plaintiffs attack were forward-looking and fall within the PSLRA's safe harbor provision. The Court additionally notes that in the context of a 12(b)(6) motion, it is too early in the litigation to reach a conclusion on whether the cautionary statements included in the earnings releases at issue are sufficiently meaningful to invoke the safe harbor provision. *See, e.g., Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734–35 (7th Cir. 2004).

## II. Plaintiff's Second Cause of Action – Violation of Section 20(a)

Section 20(a) of the Securities Exchange Act ("Exchange Act") provides derivative liability for those who control others found to be primarily liable under the Act. *In re Ramp Networks, Inc. Sec. Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same. *Id.* "To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act." *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999).

Here, Plaintiffs allege that Defendants de Geus, Shevick, and Andrews acted as controlling persons of Synopsys within the meaning of Section 20(a) of the Act and are liable thereunder for the conduct alleged. Plaintiffs claim that by reason of the Individual Defendants' positions as officers and/or directors of the Company, they were responsible for preparing and disseminating Synopsys' public releases, and had the power and authority to cause the Company to engage in the wrongful conduct complained of. Defendant argues that Plaintiffs' Section 20(a) cause of action fails because Plaintiffs have failed to state a cause of action pursuant to Section 10(b). The Court agrees. Because Plaintiffs have failed to adequately plead the underlying 10(b) violation, as discussed *supra*, Plaintiffs' Section 20(a) claim must also be dismissed.

## II. Dismissal With or Without Prejudice – Defendants' Motion For Sanctions

1    Plaintiffs requests, in the event that the Court finds that the Complaint is not pled with
2 sufficient particularity, that the Court give Plaintiffs the opportunity to amend their Complaint to
3 remedy any pleading deficiencies. Leave to amend under Federal Rule of Civil Procedure 15 is
4 liberally granted. "Dismissal with prejudice and without leave to amend is not appropriate unless it
5 is clear . . . that the complaint could not be saved by amendment." *Eminence Capital v. Aspeon Inc.*,
6 316 F.3d 1048, 1053 (9th Cir. 2003) (error to refuse leave to amend in a securities fraud case to
7 allow plaintiff to plead scienter).
8    Defendants urge the Court, in their concurrently-filed motion for sanctions, to deny Plaintiffs
9 leave to amend as a sanction. Defendants contend that Plaintiffs misrepresented their putative
10 sources of information, and manufactured the statements alleged to have been made that support
11 their Complaint. Accordingly, Defendants argue, Plaintiffs should be precluded from further
12 amending their Complaint as a sanction.
13    Rule 11 provides, in relevant part:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, – . . . the allegations and other factual contentions have evidentiary support.

A court may impose sanctions on any party, attorney, or law firm that violates Rule 11(b) or is responsible for the violation. FED. R. CIV. P. 11(c)(1)(A). The "central purpose of Rule 11 is to deter baseless filings in District Court and thus . . . streamline the administration and procedure of the federal courts . . . . Although the rule must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy . . . any interpretation must give effect to the Rule's central goal of deterrence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). By requiring certification that a pleading's allegations and factual contentions have evidentiary support, Rule 11 requires, *inter alia*, that counsel not misrepresent to the court the results of the investigation into the plaintiff's factual allegations. *See, e.g.*, *Zatko v. Rowland*, 835 F. Supp. 1174, 1181–82 (N.D. Cal. 1993) (sanctioning *pro se* plaintiff under Rule 11 for filing complaint containing untrue factual allegations and material misrepresentations). Rule 11 permits the award of either monetary or non-monetary sanctions, including dismissal of a complaint. *See, e.g., Combs v. Rockwell Int'l Corp.*,

1  927 F.2d 486, 488 (9th Cir. 1991).

2        Here, Defendants' motion for sanctions, and the accompanying declarations from the
3  witnesses upon whose statements Plaintiffs rely, raise serious questions about the accuracy of the
4  statements and opinions Plaintiffs attribute to Supervisor, SA 1, and SA 2 in their Complaint.
5  However, in their opposition to the motion, and in supplemental briefing, Plaintiffs vehemently
6  contend that the statements were made as described in the Complaint and provide the declaration of
7  their lead investigator, who avers that the witnesses' statements were given, as described, and were
8  freely given.  Therefore, it is not clear, on the current record before the Court, that Plaintiffs or their
9  counsel intended, in bad faith, to mislead the Court.  Moreover, whether the statements were made is
10 essentially a credibility question.  Rule 11 sanctions are not appropriate in that context.  *See In re*
11 *Applied Micro Circuits Corp. Sec. Litig.*, No. 01-CV-0649 K (AJB), Order (S.D. Cal. Oct 3, 2002).
12 For these reasons, the Court declines to order the relief requested by Defendants at this juncture.
13 Accordingly, Defendants' motion for sanctions is **DENIED**.  The Court's dismissal of Plaintiffs'
14 Complaint, as described herein, is without prejudice.[9]

### CONCLUSION

16       For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss without
17 prejudice and **DENIES** Defendants' motion for sanctions.  Plaintiffs must file an amended complaint
18 within thirty days of the date of this Order.

19       This Order terminates docket entry nos. 33 and 36.

21       **IT IS SO ORDERED.**

23 Dated: August_10__, 2005          MARTIN J. JENKINS
                                             UNITED STATES DISTRICT JUDGE

---

[9] The Court also **DENIES** Plaintiffs' responsive request to sanction Defendants for filing a motion for sanctions.  The Court does not find that Defendants' motion was frivolous.